1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9

10   LOUIE LOPEZ,                          Case No. 8:21-cv-1193-JGB (MAR)

11                          Plaintiff,

12            v.                           REPORT AND RECOMMENDATION
                                           OF UNITED STATES MAGISTRATE
13   CITY OF LA HABRA HEIGHTS, ET          JUDGE
     AL.,
14

15                          Defendant.

16

17

18        This Report and Recommendation is submitted to the Honorable Jesus G.

19   Bernal, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order

20   05-07 of the United States District Court for the Central District of California.

                                         **I.**

21                        **SUMMARY OF RECOMMENDATION**

22        On February 21, 2022, Plaintiff filed a First Amended Complaint ("FAC")

23   against Defendants City of La Habra Heights, Fabiola Huerta, Michael Maurer,

24   Michael Moore, Brandon Sanchez, and Rafferty Wooldridge ("Defendants").  Dkt. 73.

25   Defendants filed a Motion to Dismiss the FAC and a Motion to Strike Portions of the

26   FAC on March 7, 2022.  Dkts. 74–75.  Plaintiff filed Oppositions on April 30, 2022.

27

28

Dkts. 83–84.  Defendants filed Replies on May 16, 2022.  Dkts. 85–86.  The matters thus stand submitted for decision.

For the reasons discussed below, the undersigned recommends:

(1) **DENYING** the Motion to Dismiss with respect to Claims One and Two;

(2) **GRANTING** the Motion to Dismiss with respect to Claims Three and Four **WITHOUT LEAVE TO AMEND**;

(3) **TERMINATING** the City as a Defendant;

(4) **DENYING** the Motion to Strike;

(5) **GRANTING** Plaintiff's request to restore Scott Fazekas as a Defendant; and

(6) **DENYING** Plaintiff's request to add Timothy Peel as a Defendant.

## II.

## PROCEDURAL BACKGROUND

On July 12, 2021, Louie Lopez , proceeding pro se, filed a Civil Rights Complaint pursuant to 28 U.S.C. § 1983 against Defendants City of La Habra Heights, Dennis Laherty, Fabiola Huerta, Rafferty Wooldridge, Michael Moore, Scott Fazekas, Michael Maurer, Jared Hildenbrand, Nicholle Hornsby, Matthew Grace, the law firm Best Best & Krieger, Brandon Sanchez, Sweety Stefani, and "Does 1 through 50."  Dkt. 1 at 2–7.

On December 22, 2021, this Court granted Defendants' Motion to Dismiss in part, and denied it in part.  Dkts.  68, 70.  The Court dismissed five (5) claims without leave to amend and terminated Defendants Grace, Hornsby, Fazekas, Hildenbrand, Laherty, Best Best & Krieger, Stefani, and Does 1 through 50.  Dkt. 68 at 46.  However, the Court granted Plaintiff leave to amend three (3) other claims and denied the Motion to Dismiss with respect to one (1) claim.  Id.  The Court ordered Plaintiff to file a FAC containing the following claims only:

(1) The City and its employees violated Plaintiff's Fourteenth Amendment right to equal protection under the laws when they evicted Plaintiff and imposed

1   or attempted to impose a lien on his property instead of resolving the issue

2   through the City's policies for nonconforming residential property;

3   (2) The City violated Plaintiff's Fourteenth Amendment rights by establishing

4   and enforcing discriminatory policies, procedures, customs, and/or

5   practices;

6   (3) The City and its employees violated Plaintiff's First Amendment rights

7   when they retaliated against him by evicting him and refusing to cooperate

8   with him after the altercation at the first inspection; and

9   (4) The City and its employees conspired to mistreat and entrap Plaintiff.

10   Id.; Dkt. 70.  Plaintiff was explicitly ordered to not include any new defendants or

11   allegations not reasonably related to these claims against Defendants City of La Habra

12   Heights, Huerta, Wooldridge, Moore, Maurer, and Sanchez.  Id.

13   Plaintiff filed the instant FAC on February 21, 2022.  Dkt. 73.  The FAC

14   contains four (4) claims:

15   (1) "Violation of Federal Civil Rights" against the City, Huerta, Wooldrdige,

16   Moore, Maurer, Sanchez, Fazekas, and Timothy Peel ("Claim One");[1]

17   (2) "Conspiracy" against the City, Maurer, Sanchez, Huerta, Wooldridge, and

18   Fazekas ("Claim Two");

19   (3) "Abuse of Office/Authority" against the City, Huerta, Wooldridge, Moore,

20   Maurer, and Sanchez ("Claim Three");

21   (4) "Unreasonable Search" against the City, Maurer, Sanchez, Wooldridge,

22   Fazekas, and Peel ("Claim Four").

23   Id. at 21–54.  Plaintiff seeks damages totaling $4,000,000 as well as an order that his

24   electricity be restored and an injunction protecting him from further accusations of

25   code violations through the implementation of nonconforming use policies.  Id. at

26   54–55.

27   _____

28   [1] As discussed below, the undersigned construes as a retaliation claim under the First Amendment.
See below, subsection VI.A.

3

### III.

### FACTUAL ALLEGATIONS

Plaintiff alleges as follows:

**A.     FIRST INSPECTION AND EVICTION**

Plaintiff, a retired law enforcement officer for the State of California, has owned property on Vista Del Valle Way ("the Property") in La Habra Heights, California ("the City") since 2004. Dkt. 73 at 6.  Plaintiff has had fraught dealings with the City dating back to 2018.  Id.  In the summer of 2018, Plaintiff had began to make small changes and improvements to the Property.  Id.  "Through deceit," the City obtained an inspection warrant on the Property from the court ("First Warrant").  Id.  On July 16, 2018, City employees, together with the City attorney, a fire marshal, and a sheriff, executed the First Warrant without giving twenty-four (24) hour advanced notice.  Id. at 6–7.  Plaintiff called his brother and Los Angeles Deputy District Attorney, David Lopez, for help.  Id.  David told the City employees that without the twenty-four (24) hour advanced notice, they should not have come to execute the First Warrant.  Id.  David thought the execution of the warrant was "an outrage and was an overreach of government authority," given there were not any criminal activities or other law violations.  Id.  David and City Building Inspector Michael Moore ("Defendant Moore"), "exchanged a few words."  Id.  David told Defendant Moore to leave the property and to stop threatening the cleaning lady with jail time.  Id.  Plaintiff alleges Defendant Moore has "held a grudge" against Plaintiff ever since this incident.  Id.  Ultimately, the City abandoned the inspection.  Id.

David filed for an ex parte hearing on July 18, 2018, at the Norwalk Superior Court seeking to enjoin the City from executing the warrant.  Id.  The court "quashed the warrant obtained through fraud."  Id.  Subsequently, in 2020, Judge John A. Torribio "reprimanded the City for not following his order."  Id. at 7–8.  Plaintiff alleges this further frustrated the City employees.  Id.  The City ultimately executed the First Warrant on August, 6 2018, after giving twenty-four (24) hour advanced

1    notice.  <u>Id.</u>  The City concluded Plaintiff had added rooms without the proper permits

2    and told him to bring the house back to its original condition.  <u>Id.</u>  Plaintiff argues this

3    was impossible because he was unable to obtain the original plans/blueprints for the

4    Property.  <u>Id.</u>  In fact, in 2005, the City had told Plaintiff that the original

5    plans/blueprints of the Property did not exist after Plaintiff asked for them.  <u>Id.</u>

6    Plaintiff argues the only possibility is that the City either misplaced, destroyed, or lost

7    the plans/blueprints.  <u>Id.</u>

8        On August 28, 2018, three (3) weeks after the inspection, City employees

9    posted a notice on Plaintiff's front door with the words "UNSAFE BUILDING, DO

10   NOT ENTER AND OCCUPY; This Property is ordered vacated by the City of La

11   Habra Heights Building official."  <u>Id.</u>  On that same day, Defendant Moore told

12   Plaintiff, "[w]e just came back from a house where part of the drywall had to be

13   removed.  It happens all over here in the Heights.  You are not the only one.  We will

14   work [it] out with you."  <u>Id.</u>

15        On September 4, 2018, Building Official Scott Fazekas brought Assistant

16   Manager Rafferty Wooldridge ("Defendant Wooldridge"), the City Attorney, a

17   locksmith, Community Development Department Coordinator Nicholle Hornsby, the

18   fire marshal, Assistant fire chief, and the sheriff to the Property and disconnected

19   Plaintiff's electricity.  <u>Id.</u> at 9.  Plaintiff heard Hornsby advise and point to Fazekas the

20   Property's electricity panel, asking "[d]o you need the panel open" and "[a]re you

21   going to examine the panel?"  <u>Id.</u>  Fazekas replied, "[t]hat won't be necessary, I've

22   seen enough."  <u>Id.</u>  At no time did Plaintiff observe any City officials examine or use

23   any type of electrical meter to examine the residence's electrical panel.  <u>Id.</u>  Fazekas

24   cut off the electricity to the Property.  <u>Id.</u>  Plaintiff was then evicted from the

25   Property.  <u>Id.</u>  Plaintiff argues there was no exigence to justify the eviction and that he

26   was never given a chance to contest or appeal the City's decision.  <u>Id.</u>

27        Plaintiff alleges, despite Defendant Moore's assurance that they would "work

28   out" a solution with Plaintiff, the City and its employees ignored Plaintiff's attempts

to do so.  Id.  On four (4) separate occasions between September 2018 and November 2019, Plaintiff's architect Ernie Ybarra visited the City, even speaking with Defendant Wooldridge twice, with no effect.  Id.  On January 2020, Plaintiff brought Richard Lara, a licensed contractor, to the City to discuss the case, but the contractor was also "sent away" by Defendant Wooldridge.  Id. at 9–10.  Plaintiff concludes that the City chose not to work out a solution with him, like they would with a white resident.  Id.

**B.   CODE OF COMPLIANCE AGREEMENT**

On February 8, 2020, City Attorney Brandon Sanchez ("Defendant Sanchez") sent Plaintiff a "Code of Compliance Agreement" ("the Agreement").  Dkt. 73 at 10. The Agreement imposed administrative costs on Plaintiff in the amount of $16,000 and attorneys' fees in the amount of $37,406.98, totalling $53,406.98.  Id.  It further stipulated that the total cost shall constitute a lien on the Property.  Id.  Plaintiff found the Agreement unreasonable and unacceptable, and therefore he and the co-owner of the Property, Joel Lopez, both refused to sign the Agreement.  Id.

On February 14, 2020, Plaintiff filed a complaint with the State Bar of California and sent a copy to the City, in which Plaintiff proposed the Department of Regional Planning of Los Angeles County perform an inspection as a third party.  Id. at 15–16.  The City never responded to this proposal.  Id.

On July 16, 2020, Defendant Sanchez sent Plaintiff a "Request for Consent to Inspect Property."  Id. at 11.  The letter threatened court action if Plaintiff did not consent to the inspection.  Id.  Plaintiff did not consent; because he had already been evicted, Plaintiff reasoned there was no "exigency to legitimize a second inspection." Id.

**C.   SECOND INSPECTION**

On August 5, 2020, Defendant Sanchez and City Attorney Michael Maurer ("Defendant Maurer") obtained another inspection warrant from the court ("Second Warrant").  Dkt. 73 at 11.  On August 12, 2020, the City placed notice of the

inspection on the front door of the Property, which was then empty following Plaintiff's eviction two (2) years earlier.  Id.  Plaintiff argues the City knew or should have known that this notice was not likely to be effective, and therefore should have sent it by mail to Plaintiff's address or called Plaintiff.  Id.  A neighbor saw the notice on the door of the Property and informed Plaintiff at 3 p.m. on August 12, 2020.  Id.  At 5 p.m., Plaintiff asked his relative Wen-Tzu Davis to call and inform Defendant Wooldridge that there would be an ex parte hearing the next morning at 8:30 a.m. at Norwalk Superior Court seeking to enjoin the execution of the Second Warrant.  Id.  Defendant Wooldridge told Davis that he would "notify the City Attorney."  Id.

Neither the City Attorney, nor anyone else from the City, attended the August 13, 2020 hearing.  Id. at 12.  Judge John A. Torribio ruled without the City's presence and ordered the City to give twenty-four (24) hour notice and conduct the inspection between 9 a.m. and 5 p.m. on a weekday.  Id.  Plaintiff went to the Property at 9:50 a.m., but found that Defendants Sanchez and Wooldridge, along with Fazekas, Assistant Fire Chief Timothy Peel, Fireman Robert Montaghami, and Nicholle Hornsby, had already completed the second inspection.  Id.  Peel gave Plaintiff a "disdainful look" as he approached Plaintiff in a "provocative manner in an attempt to escalate the situation."[2]  Id. at 13.  Plaintiff ignored Peel and unlocked the pool equipment as directed by Fazekas.  Id.  Plaintiff advised the entire group that they were "illegally searching Plaintiff's property" after ignoring the court hearing scheduled for that morning.  Id.

Plaintiff alleges that Peel and Montaghami tried to "intimidate/demoralize" Plaintiff by providing security for a locksmith, where none was needed.  Id. at 14.

---

[2] Plaintiff notes this was not the "first run in" with Peel's "bully type tactics."  Dkt. 73 at 13–14.  He appears to describe an incident where Peel and Defendant Wooldridge were "questioning teenagers in the parking lot of Plaintiff's property," and Peel was "showing a small type badge" to the teens.  Id.  Plaintiff also notes that Peel was subsequently arrested for impersonating a police officer.  Id. at 14–15.  It is unclear how any of this is particularly relevant to Petitioner's claims.

1   Peel also remarked "good luck getting a permit," while Plaintiff was explaining to

2   Fazekas how a broken water pipe had been repaired.  Id.

3        On August 24, 2020, after the second inspection, Fazekas sent a "Legal Notice

4   and Order to Repair or Abate."  Id.  Plaintiff "presented a plan in response," which

5   Fazekas rejected by sending Plaintiff "Residential Plan the first Corrections" on

6   December 10, 2020.  Id.  Plaintiff presented a second Plan in response, but Fazekas

7   rejected it by sending a second "Residential Plan Correction" on April 12, 2021.  Id.

8        Plaintiff alleges the City refuses to follow their own policy on Nonconforming

9   houses like the Property, which was built before the City's incorporation.  Id. at 16.

10  Plaintiff cites the City's 2004 "General Plan" for these policies.  Id.  Plaintiff alleges

11  the City has an obligation to assist Plaintiff to obtain a "Grandfather in" or the

12  appropriate permits.  Id. at 16–17.

13       Ultimately, Plaintiff alleges the City has treated him harshly and refused to

14  work out an alternative solution in retaliation for the first altercation with Plaintiff and

15  his brother at the first inspection.  Id. at 17.  Plaintiff supports this allegation with

16  statements made to him by Sweety Stefani, a former tenant.  Id. at 18.  Plaintiff alleges

17  that on March 19. 2020, Stefani told him she had been Plaintiff's "protector" in City

18  Hall.  Id.  She explained that several individuals in City management hated Plaintiff

19  and his brother, specifically naming Defendant Fabiola Huerta.  Id.  According to

20  Stefani, Huerta approached her to be an "informant" and testify against Plaintiff in

21  future court proceedings.  Id.  Stefani told Plaintiff that the City employees are "trying

22  to get you until you lose your house.  You have no chance in hell to have any type of

23  relief or assistance while Fabiola Huerta, Michael Moore, and Rafferty Wooldridge are

24  in position."  Id.  She told Plaintiff the only chance he had to get assistance is to wait

25  until Fabiola Huerta rotates to another city.  Id.

26       Alternatively and additionally, Plaintiff alleges that the City is exploiting

27  Plaintiff in order to gain revenue in the form of penalties for building code violations.

28  Id. at 18–19.  Plaintiff alleges that at a May 2020 municipal administration meeting,

1    which was broadcasted on TV, the mayor mentioned the shortage of money and told

2    Defendant Huerta, the City Manager, to collect fines imposed on several violation

3    cases.  Id.  Plaintiff argues his case must be one of the targeted ones, since the City

4    attempted to get Plaintiff to sign the "Code of Compliance Agreement."  Id.  Plaintiff

5    appears to allege the City's disparate treatment of him was partially due to the fact that

6    he is a person of color.  Id.

7           Plaintiff remains evicted and homeless to this day.  Id. at 19.

8                                              **IV.**

9                **MOTION TO STRIKE PORTIONS OF PLAINTIFF'S FAC**

10   **A.     APPLICABLE LAW**

11          Fed. R. Civ. P. 12(f) ("Rule 12(f)") provides that a "court may strike from a

12   pleading ... any redundant, immaterial, impertinent, or scandalous matter ... on its

13   own, or on motion made by a party either before responding to the pleading or, if a

14   response is not allowed, within 21 days after being served with the pleading."  Fed. R.

15   Civ. P. 12(f).  "The function of a 12(f) motion to strike is to avoid the expenditure of

16   time and money that must arise from litigating spurious issues by dispensing with

17   those issues prior to trial."  Whittlestone, Inc. v. Handi–Craft Co., 618 F.3d 970, 973

18   (9th Cir. 2010) (internal quotation marks omitted).  Motions under Rule 12(f) are

19   "generally regarded with disfavor because of the limited importance of pleading in

20   federal practice[.]"  Neilson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101, 1152

21   (C.D. Cal. 2003).  A court has discretion in determining whether to strike matter from

22   a pleading.  Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1528 (9th Cir. 1993), rev'd on

23   other grounds, 510 U.S. 517 (1994).

24   **B.     ANALYSIS**

25          In the December 22, 2021 Order, the Court dismissed Plaintiff's Complaint

26   and ordered Plaintiff to file a First Amended Complaint.  Dkt. 70.  Notably, the Court

27   dismissed Plaintiff's claims against Scott Fazekas without leave to amend.  Id. at 1–2.

28   Furthermore, the Court cautioned Plaintiff to "not include [in the First Amended

Complaint] new defendants or allegations that are not reasonably related to the remaining claims—specifically, [retaliation and equal protection claims] against Defendants City of La Habra Heights, Huerta, Wooldridge, Moore, Maurer, and Sanchez." <u>Id.</u> at 2.

In their Motion to Strike, Defendants request that the Court strike claims that Plaintiff has added without leave and in contravention of this Court's December 22, 2021 Order.  Dkt. 75.  Specifically, Defendants request the Court strike Claims Three and Four, as well as all claims against Scott Fazekas and Timothy Peel.

With respect to Claims Three and Four, Defendants argue separately in their concurrently filed Motion to Dismiss that these claims are subject to dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)").  Dkt. 74 at 21–23.  As discussed below, the undersigned agrees and recommends granting Defendants' Motion to Dismiss with respect to Claims Three and Four; Defendants' Motion to Strike should therefore be **DENIED** as moot with respect to these claims.

With respect to putative Defendants Fazekas and Peel, the Court should decline to exercise discretion to strike them from the FAC.  Though Defendants argue that Plaintiff has not sought leave to amend, Plaintiff clearly labels Fazekas and Peel as "proposed" Defendants in his FAC.  Dkt. 73 at 4–5 ("Proposed Defendant No. 7 is waiting on Judge's order to serve First Amended Complaint and Summon…"); 21 ("Claim One…Against… (Proposed Defendant) Scott Fazekas and (Proposed Defendant) Timothy Peel").  Though Plaintiff could have been more explicit, it is clear Plaintiff seeks the Court's permission to add Defendants Fazekas and Peel to the action and therefore is not ignoring or directly contravening the Court's December 22, 2021 Order.

With this in mind, and given that motions to strike are generally disfavored, Plaintiff's claims against Fazekas and Peel should be evaluated for failure to state a claim under Rule 12(b)(6) rather than struck as irrelevant or impertinent under Rule 12(f).  Notably, this is not a situation where a plaintiff attempts to bring in claims or

defendants wholly unrelated to the original allegations; if this were the case, a Rule 12(f) motion to strike may be appropriate.  However, here, Plaintiff clearly alleges both Peel and Fazekas were involved in the alleged retaliatory scheme that forms the sole basis for his claims.  In fact, Plaintiff alleges they were both present at Second Inspection.  Dkt. 73 at 12–14.  Therefore, their inclusion in the FAC is not plainly immaterial.

Accordingly, Defendants' Motion to Strike should be **DENIED** with respect to claims against Fazekas and Peel.  As discussed below, Plaintiff has failed to state a claim against Peel, but should be permitted to restore Fazekas as a Defendant.

## V.

## RULE 12(b)(6) STANDARD OF REVIEW

Under Rule 12(b)(6), a party may move to dismiss a pleading for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). Furthermore, a trial court may dismiss a claim sua sponte and without notice under Rule 12(b)(6) "where the claimant cannot possibly win relief."  Omar v. Sea-Land Serv., Inc., 813 F.2d 986, 991 (9th Cir. 1987); Baker v. Director, U.S. Parole Comm'n, 916 F.2d 725, 726 (D.C. Cir. 1990) (per curiam) (adopting Ninth Circuit's position in Omar and noting that in such circumstances a sua sponte dismissal "is practical and fully consistent with plaintiffs' rights and the efficient use of judicial resources").  The court has authority to sua sponte dismiss claims against defendants who have not been served and defendants who have not yet answered or appeared.  See Abagnin v. AMVAC Chemical Corp., 545 F.3d 733, 742–43 (9th Cir. 2008) ("As a legal matter, we have upheld dismissal with prejudice in favor of a party which had not appeared, on the basis of facts presented by other defendants which had appeared.").

A claim should be dismissed under Rule 12(b)(6) if the plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content

1   that allows the court to draw the reasonable inference that the defendant is liable for

2   the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

3          Dismissal for failure to state a claim can be warranted based on either a lack of

4   a cognizable legal theory or the absence of factual support for a cognizable legal

5   theory. See, e.g., Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th

6   Cir. 2008). A complaint may also be dismissed for failure to state a claim if it

7   discloses some fact or complete defense that will necessarily defeat the claim.

8   Franklin v. Murphy, 745 F.2d 1221, 1228–29 (9th Cir. 1984), abrogated on other

9   grounds by Neitzke v. Williams, 490 U.S. 319 (1989). Although the plaintiff must

10  provide "more than labels and conclusions," Twombly, 550 U.S. at 555, "[s]pecific

11  facts are not necessary; the [complaint] need only give the defendant[s] fair notice of

12  what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551

13  U.S. 89, 93 (2007) (per curiam) (citations and quotation marks omitted).

14         In considering whether a complaint states a claim, a court must accept as true

15  all of the material factual allegations in it. Hamilton v. Brown, 630 F.3d 889, 892–93

16  (9th Cir. 2011). However, a court need not accept as true "allegations that are merely

17  conclusory, unwarranted deductions of fact, or unreasonable inferences." In re

18  Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008). The court must also

19  construe the pleading in the light most favorable to the pleading party and resolve all

20  doubts in the pleader's favor. See, e.g., Berg v. Popham, 412 F.3d 1122, 1125 (9th Cir.

21  2005). Pro se pleadings are "to be liberally construed" and are held to a less stringent

22  standard than those drafted by a lawyer. Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir.

23  2010) ("Iqbal incorporated the Twombly pleading standard and Twombly did not

24  alter courts' treatment of pro se filings; accordingly, we continue to construe pro se

25  filings liberally when evaluating them under Iqbal.").

26         If a court finds the complaint should be dismissed for failure to state a claim, a

27  court has discretion to dismiss with or without leave to amend. Lopez v. Smith, 203

28  F.3d 1122, 1126–30 (9th Cir. 2000) (en banc). Leave to amend should be granted if it

appears possible the defects in the complaint could be corrected, especially if the plaintiff is pro se.  Id. at 1130–31; see also Cato v. United States, 70 F.3d 1103, 1106 (9th Cir. 1995).  However, if, after careful consideration, it is clear a complaint cannot be cured by amendment, a court may dismiss without leave to amend.  Cato, 70 F.3d at 1105, 1107–11.

# VI.

## DISCUSSION

## A.    PLAINTIFF HAS STATED A FIRST AMENDMENT RETALIATION CLAIM

### 1.    Applicable law

"To state a First Amendment retaliation claim, a plaintiff must plausibly allege that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct."  Capp v. Cty. of San Diego, 940 F.3d 1046, 1053 (9th Cir. 2019) (internal quotation marks omitted) (internal citations omitted).

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . .."  U.S. Const. amend. I.  The First Amendment also guarantees the right "to petition the Government for a redress of grievances."  White v. Lee, 227 F.3d 1214, 1227 (9th Cir. 2000)

Furthermore, to state a First Amendment retaliation claim, Plaintiffs do not need to show their "speech was actually inhibited or suppressed."  Lacey v. Maricopa Cty., 693 F.3d 896, 916 (9th Cir. 2012) (quoting Mendocino Envtl. Ctr. v. Mendocino Cty., 192 F.3d 1283, 1300 (9th Cir. 1999)) (internal quotation marks omitted).  Rather, courts look to "whether an officials' acts would chill or silence a person of ordinary firmness from future First Amendment activities."  Id. at 916–17.  "Where government conduct has been found to have a chilling effect, it has been 'regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or

13

1  prospectively subject to the regulations, proscriptions, or compulsions that he was

2  challenging.' " Laird v. Tatum, 408 U.S. 1, 11 (1972).  Furthermore, " 'the threat of

3  invoking legal sanctions and other means of coercion, persuasion, and intimidation'

4  can violate the First Amendment." White, 227 F.3d at 1228 (citing Mendocino Envtl.

5  Ctr., 192 F.3d at 1300).

6      **2.**    **Analysis**

7          **a.**    **Whether Plaintiff brings a retaliation claim**

8       As an initial matter, the undersigned disagrees with Defendants' contention that

9  Plaintiff has not included his retaliation claim in the FAC.  Plaintiff's "Claim One"

10  cites both the First and Fourteenth Amendments, and Plaintiff consistently refers to

11  Defendants' conduct as "retaliatory."  Dkt. 73 at 24 ("Thus, all Defendants violated

12  Plaintiff's right protected by the First Amendment…"), 26 ("Defendant Fabiola

13  Huerta has been deeply involved in Defendants' systemic retaliatory acts against

14  Plaintiff…[and] hence violated Plaintiff's rights protected by the 1st and 14th

15  Amendments…"), 36 ("As stated in Claim 1, City and City Employees-Defendants

16  violated Plaintiff's rights protected by the 1st and 14th Amendments to the U.S.

17  Constitution by discrimination based on retaliation.").

18       In fact, the FAC makes clear that, to the extent Plaintiff brings both an equal

19  protection claim and retaliation claim, Plaintiff's equal protection claim is largely a

20  restatement of Plaintiff's retaliation claim; either way, Plaintiff is alleging he was

21  treated differently in retaliation for exercising his First Amendment rights.  In cases

22  where plaintiffs bring both a retaliation claim and an equal protection claim based on

23  retaliation, other federal courts have considered the retaliation claim, and dismissed

24  the equal protection claim as duplicative.  See Occhionero v. City of Fresno, No. CVF

25  05-1184 LJO-SMS, 2008 WL 2690431, at *8 (E.D. Cal. July 3, 2008), aff'd, 386 F.

26  App'x 745 (9th Cir. 2010) (noting "[f]ederal courts have precluded assertion of First

27  Amendment claims as Equal Protection claims," collecting cases, and holding the

28  plaintiff's equal protection claim "of different treatment in retaliation for speech is a

14

First Amendment claim which does not invoke the Equal Protection Clause"); Olson v. Bynum, No. 2:20-CV-2481-TLN-KJN PS, 2022 WL 2052696, at n.14 (E.D. Cal. June 7, 2022) (noting the plaintiff's equal protection and retaliation claim were "substantively indistinguishable" and warning that the court may recommend dismissal of the equal protection claim as duplicative).  Here, Claim One could be construed to state either a retaliation claim, and equal protection claim, or both.  The undersigned follows the approach taken by our sister courts and construes Claim One as a claim for retaliation under the First Amendment, dismissing any concurrent equal protection claim based on the same conduct.

### b.    Plaintiff's equal protection claim based on race

The FAC could be construed to bring an equal protection claim based on race, in addition to one based on retaliation.  However, though Plaintiff does mention his race at different points and appears to allege Defendants' alleged mistreatment may be partially racially motivated, Plaintiff does not allege any facts that could possibly give rise to an inference of racial animus.  See Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1026 (9th Cir. 1998) (holding that, to state a race-based equal protection claim, a plaintiff "must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent.").   Plaintiff merely makes a conclusory statement that he would have been treated differently if he were white. Dkt. 73 at 10.  By contrast, he specifically cites retaliation as Defendants' primary motivation several times.  Id. at 17–19, 23 ("this discrimination is based on retaliation"), 24 ("All defendants also violated Plaintiff's equal protection right guaranteed by the 14th Amendment to the US Constitution when they singled out Plaintiff as a target of retaliation and exploitation and treated Plaintiff differently"), 34 ("retaliation is the driving force of all defendants' wrongdoings against Plaintiff").

Construing Plaintiff's claim in the context of his allegations and the FAC as a whole, it's clear that retaliation is the primary theory underlying his equal protection claim.  Thus, the court construes Plaintiff's equal protection claim as one based on

1   retaliation, rather than on racial discrimination.  Alternatively, to the extent the FAC

2   could be construed to bring a separate equal protection claim based on racial

3   discrimination in addition to one based on retaliation, Plaintiff has failed to state a

4   claim and thus it should be **DISMISSED**.

5              c.       **Plaintiff's retaliation claim against the City**

6          The Court has already found that Plaintiff  stated a retaliation claim against

7   Defendant Wooldridge in his original Complaint.  Dkts. 68 at 37–38; 70.  Plaintiff

8   includes substantially similar allegations in his FAC, and thus the Court need not

9   reiterate the same analysis.  Construing Claim One as a retaliation claim, the FAC

10  clearly states a claim against Defendant Wooldridge.  As discussed below, Plaintiff has

11  successfully alleged the existence of a conspiracy between Defendants Wooldridge,

12  Moore, Huerta, Fazekas, Sanchez, and Maurer as to justify their inclusion in his

13  retaliation claim.

14         However, to the extent Plaintiff includes the City as a Defendant in his

15  retaliation claim, Plaintiff has failed to state a claim against the City.  As discussed in

16  the Court's previous Report and Recommendation, Plaintiff's original Complaint

17  failed to allege the City employees acted pursuant to a policy or practice.  Dkt. 68 at

18  33–35.  The FAC has not improved in this respect; in fact, to support his allegations

19  of retaliation, Plaintiff explicitly alleges the City employees acted contrary to

20  established policies.  Dkt. 70 at 17, 28, 46 ("The City, in fact, has had a policy and

21  practice to "work out a solution" with code violators…The City and its Employees-

22  Defendants did not follow their General Plan that provides protections guaranteed by

23  policy and law, but chose to take drastic actions against Plaintiff.").

24         Nor are Plaintiff's allegations that he is being targeted as part of the City's

25  alleged scheme to gain revenue in the form of penalties for building code violations

26  sufficient to show the Defendants have acted pursuant to a City Policy.  Even

27  assuming Plaintiff's conclusory allegations regarding this scheme are true, this would

28  cut against Plaintiff's allegations that he was being targeted for retaliatory or

1   discriminatory treatment by ascribing an independent motivation to the City employee

2   Defendants.  In other words, while, at best, these allegations could support the

3   contention that the Defendants were acting pursuant to a City policy, generally, they

4   do not support the contention that this policy had the effect of being discriminatory

5   or retaliatory; in fact, they tend to show the opposite and therefore undercut

6   Plaintiff's retaliation and equal protection claims.

7        Thus, Plaintiff has failed to state a claim against the City.  See Monell v. Dep't

8   of Soc. Servs., 436 U.S. 658, 694 (1978) (holding municipality is only liable for injuries

9   that arise from an official policy or longstanding custom).  The City should therefore

10  be **TERMINATED** as a Defendant.

11  **B.**    **PLAINTIFF HAS ALLEGED A CONSPIRACY BETWEEN**

12        **DEFENDANTS WOOLDRIDGE, MOORE, HUERTA, FAZEKAS,**

13        **SANCHEZ, AND MAURER**

14      **1.**    **Applicable law**

15       "Conspiracy is not itself a constitutional tort under § 1983."  Lacey, 693 F.3d at

16  935.  Rather, a conspiracy claim can "enlarge the pool of responsible defendants by

17  demonstrating their causal connections to the violation."  Id.  In other words, alleging

18  a conspiracy in section 1983 actions can:  (1) "draw in private parties who would

19  otherwise not be susceptible to a § 1983 action because of the state action doctrine"

20  or (2) "aid in proving claims against otherwise tenuously connected parties in a

21  complex case."  Id. (internal citations omitted).

22       In order to state a claim for conspiracy under section 1983, a plaintiff must

23  allege "an agreement or 'meeting of the minds' to violate constitutional rights."

24  Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2002) (citing United Steelworkers of Am.

25  v. Phelps Dodge Corp., 865 F.2d 1539, 1540–41 (9th Cir. 1989) (en banc)).

26  Importantly, a plaintiff must also sufficiently allege an underlying constitutional

27  violation.  Hart v. Parks, 450 F.3d 1059, 1071 (9th Cir. 2006) (quoting Woodrum v.

28  Woodward Cty., Oklahoma, 866 F.2d 1121, 1126 (9th Cir. 1989)).

1    "To be liable, each participant in the conspiracy need not know the exact

2    details of the plan, but each participant must at least share the common objective of

3    the conspiracy." Franklin, 312 F.3d at 441 (quoting United Steel Workers, 865 F.2d at

4    1541).  This agreement or meeting of the minds may be inferred on the basis of

5    circumstantial evidence, such as the actions of the defendants.  Mendocino Env't Ctr.,

6    192 F.3d at 1301 (citation omitted).

7        **2.    Analysis**

8            **a.    Defendants Moore and Huerta**

9        As the undersigned found in its previous Report and Recommendation,

10   Plaintiff has clearly alleged the existence of an agreement between Defendants Huerta,

11   Wooldridge, and Moore to retaliate against Plaintiff.  Dkt. 68 at 40–41.  The Court

12   dismissed the claims against Huerta and Moore because it was not clear they had

13   made the agreement or taken any specific action in furtherance of the conspiracy

14   within the statute of limitations period.  Id.  In the FAC, however, Plaintiff attaches

15   more specific dates to his allegations.  Importantly, he alleges Defendant Huerta

16   signed the Code of Compliance Agreement, along with Defendant Maurer, in 2020.

17   Dkt. 73 at 25–26.  This ties Defendant Huerta to specific conduct that is not barred

18   by the statute of limitations and serves as circumstantial evidence she was acting in

19   furtherance of the conspiracy described to Plaintiff by Sweety Stefani.  Accordingly,

20   Plaintiff has stated a retaliation claim against Defendant Huerta through a conspiracy

21   theory.

22       Similarly, with respect to Defendant Moore, Plaintiff has clarified his

23   allegations with respect to Moore's role in the alleged retaliatory conspiracy.  The

24   FAC does not describe any discrete retaliatory acts that Moore was personally

25   involved in since July 2019; Sweety Stefani's March 2020 description of the conspiracy

26   between Huerta, Wooldridge, and Moore remains the only post-2019 event tying

27   Moore to Plaintiff's case.  Id. at 28–29.  Still, Plaintiff alleges all City employees have

28   been retaliating against Plaintiff in response to the initial confrontation between

Moore and Plaintiff at the first inspection.  Id. at 17–18.  Furthermore, Plaintiff notes that Moore is still in his role as the City's Building Inspector, where his contractual duties include "reviewing plans and issuing permits."  Id. at 28.  Furthermore, Plaintiff has alleged that the City's Building Department, where Moore works, has taken more recent retaliatory acts against him, including conducting the Second Inspection, "coercing" Plaintiff to sign the Code of Compliance Agreement," and continuing to refuse to "work with" Plaintiff to reach a solution on the Property.  Id. at 10–17.  It would seem illogical that the one City employee who was involved in the confrontation that forms the basis for Plaintiff's retaliation claim, who still works at the City's Building Department, would not be involved in any potential collective mistreatment of Plaintiff.

Plaintiff could not possibly know what goes on within the City Building Department's closed doors.  Considering this together with the facts that Moore was the central figure in the initial confrontation, still works in the Building Department with the other Defendants, and was specifically named in Stefani Sweety's March 2020 confession, Plaintiff has provided sufficient circumstantial evidence to state a retaliation claim against Defendant Moore based on a theory of conspiracy.  In coming to this conclusion, the undersigned places weight on the fact that the theory behind conspiracy liability is to "enlarge the pool of responsible defendants" to "aid in proving claims against otherwise tenuously connected parties."  Lacey, 693 F.3d at 935.  Plaintiff's inability to allege the specific actions Moore has taken to advance the alleged retaliatory scheme appears to be a quintessential example of why conspiracy liability exists.

### b.   Defendants Sanchez and Maurer

Plaintiff has also supplemented and clarified his allegations against Defendants Sanchez and Maurer.  Plaintiff alleges Sanchez and Maurer have assisted Defendants Moore, Huerta, and Wooldridge to retaliate against Plaintiff through their work as City counsel—specifically, through Sanchez' drafting the Agreement, Sanchez's

1  leading of the Second Inspection, and Sanchez's and Maurer's requesting the Second

2  Inspection warrant.  Dkt. 73 at 41.

3        With respect to the Code of Compliance Agreement, Plaintiff alleges that the

4  Agreement imposed such unreasonable fees upon him that it shows the Agreement

5  was a "scam" or "extortionate."  Id. at 41.  Defendants Sanchez and Maurer prepared

6  this Agreement, and Defendant Maurer signed the agreement along with Defendant

7  Huerta, who Plaintiff alleges agreed with Moore and Wooldridge to retaliate against

8  him.  Id.  Though Maurer and Sanchez were not named by Sweety Stefani as members

9  of the alleged conspiracy, taking Plaintiff's allegation as true that the received

10  Agreement imposed unreasonable fees without explanation, their drafting and signing

11  an unreasonable agreement with a member of the alleged conspiracy is circumstantial

12  evidence tending to show Sanchez and Maurer were a part of the common objective

13  to mistreat Plaintiff.

14        With respect to the Second Inspection, Plaintiff alleges City officials

15  disregarded typical procedures, obtained the warrant deceitfully, and disobeyed court

16  orders.  Id. at 49–50.  Given that Plaintiff was already evicted, and therefore no

17  "exigency" existed to inspect his house, Plaintiff alleges the Second Inspection had no

18  other purpose besides intimidating him and keep him out of his house.  Id. at 14–16,

19  21.  Accepting Plaintiff's allegations as true and crediting his inference that the Second

20  Inspection was without reasonable purpose, the fact that Sanchez and Maurer

21  obtained the warrant for the inspection and Sanchez participated in the inspection is

22  further circumstantial evidence that Sanchez and Maurer were a part of the common

23  objective to retaliate against Plaintiff.

24        Plaintiff's conspiracy theory is admittedly more tenuous with respect to

25  Sanchez and Maurer, given there is no allegation that they explicitly agreed with the

26  other Defendants to mistreat Plaintiff.  However, given that we are at this early stage

27  of the litigation, the Court finds the above allegations sufficient to incorporate them

28  as Defendants via a conspiracy theory.

### d. Proposed Defendant Fazekas

As noted above, the Court previously dismissed claims against Defendant Fazekas because Plaintiff had not alleged any facts showing Fazekas was involved in Plaintiff's case at all post-2018.  Dkt. 68 at 28.  However, in the FAC, Plaintiff clarifies that Fazekas was at the Second Inspection and has been corresponding with Plaintiff about proposed corrections to the Property. Dkt. 73 at 16, 31–32.  Similar to Defendant Moore, considering the fact that Fazekas was present at the First Inspection where the inciting incident occurred, the fact that Fazekas is still employed in the City's Building Department and involved in Plaintiff's case is circumstantial evidence that he could be involved in any alleged conspiratorial retaliation.  Furthermore, as with Defendants Sanchez and Maurer, Fazekas involvement in an inspection that Plaintiff alleges had no legitimate purpose and was conducted in violation of the typical procedures is further circumstantial evidence that he shared the common objective of retaliating against Plaintiff.  Accordingly, accepting Plaintiff's allegations as true, Plaintiff has stated a retaliation claim against Fazekas via a conspiracy theory.

### e. Proposed Defendant Peel

Plaintiff has alleged Peel was present at the Second Inspection, in part to "intimidate" Plaintiff.  Dkt. 73 at 14.  Plaintiff also alleges that, on an undisclosed date, Peel "bullied" teenagers in the parking lot of Plaintiff's property and was subsequently arrested for impersonating a police officer.  Id. at 14–15.  However, it is not clear how these allegations are related to the other Defendants' alleged retaliation against Plaintiff.  Nor does Plaintiff allege that Peel was involved in the alleged retaliatory scheme either before or after the Second Inspection.  Notably, Peel is an Assistant Fire Chief and therefore does not work in the Building Department with the other City employee Defendants that Plaintiff alleges are conspiring to retaliate against him.  Without more, Peel's mere presence at a single inspection is insufficient to show Peel shared a common objective with the other Defendants to retaliate against

1   Plaintiff.  Accordingly, Plaintiff has failed to state a retaliation claim against Peel via a

2   conspiracy theory.

3   **C.     CLAIM THREE MUST BE DISMISSED BECAUSE CRIMINAL**

4   **STATUTES DO NOT PROVIDE A PRIVATE CAUSE OF ACTION**

5   **1.     Applicable law**

6   Criminal statutes generally do not provide a private cause of action or a basis

7   for civil liability.  See Ellis v. City of San Diego, 176 F.3d 1183, 1189 (9th Cir. 1999)

8   (affirming district court's dismissal of sixteen (16) claims based on California Penal

9   Code sections because "these code sections do not create enforceable individual

10  rights").

11  **2.     Analysis**

12  In Claim Three, Plaintiff appears to seek damages for Defendants' violation of

13  25 C.F.R. § 11.448, which criminalizes abuse of office in Native American lands.  Dkt.

14  73 at 44–49; 25 C.F.R. §§ 11.104 ("The regulations in this part continue to apply to

15  each area in Indian Country…"), 11.448.  However, this criminal statute does not

16  provide a basis for civil liability.  See 25 C.F.R. § 11.448.  Furthermore, 25 C.F.R. §

17  11.448 applies to Native American lands, and therefore is wholly inapplicable here.

18  See Williams v. Cnty. of Fresno, No. 1:21-CV-00648-AWI-SAB, 2021 WL 3052526

19  (E.D. Cal. July 20, 2021), report and recommendation adopted, No. 1:21-CV-00648-

20  AWI-SAB, 2021 WL 5399905 (E.D. Cal. Nov. 18, 2021) (dismissing civil rights

21  complaint where plaintiff had alleged a violation of 25 C.F.R. § 11.448, noting 25

22  C.F.R. § 11.448 "applies to areas of Indian country and is inapplicable").  Accordingly,

23  Claim Three should be dismissed.

24  **D.     CLAIM FOUR MUST BE DISMISSED BECAUSE PLAINTIFF HAS**

25  **FAILED TO STATE A FOURTH AMENDMENT CLAIM**

26  **1.     Applicable law**

27  The Fourth Amendment generally prohibits warrantless searches and seizures.

28  U.S. Const. amend. IV.  "[P]hysical entry of the home is the chief evil against which

the wording of the Fourth Amendment is directed." <u>Payton v. New York</u>, 445 U.S. 573, 585 (1980) (internal quotation marks omitted).  Accordingly, it is a "basic principle of Fourth Amendment law" that searches and seizures inside a home, and even mere entry into a home, "are presumptively unreasonable" without a warrant. <u>LaLonde v. Cnty. of Riverside</u>, 204 F.3d 947, 954 (9th Cir. 2000) (quoting <u>Payton</u>, 445 U.S. at 586) (internal quotation marks omitted); <u>see also</u> <u>Mendez v. Cty. of Los Angeles</u>, 897 F.3d 1067 (9th Cir. 2018) ("[Without a warrant, consent, or exigent circumstances] the Fourth Amendment imposes a duty on officers not to enter. And it is entry itself that constitutes the breach of that duty.").

This warrant requirement also applies to administrative inspections.  <u>See, e.g.,</u> <u>Grady v. North Carolina</u>, 135 S. Ct. 1368, 1371 (2015) ("A building inspector who enters a home simply to ensure compliance with civil safety regulations has undoubtedly conducted a search under the [4th] Amendment") (citation omitted). However, the showing required for a valid warrant in this context is less demanding than the probable cause standard in criminal cases.  <u>Camara v. Municipal Court of City and County of San Francisco</u>, 387 U.S. 523, 538 (1967).  Administrative warrants only require either (1) specific evidence of an existing violation at a particular location; or (2) a showing that "reasonable legislative or administrative standards for conducting an ... inspection are satisfied with respect to [the location]."  <u>Marshall v. Barlow's, Inc.</u>, 436 U.S. 307, 320–21 (1978) (quoting <u>Camara</u>, 387 U.S. at 538).  Still, administrative search warrants "should normally be sought only after entry is refused unless there has been a citizen complaint or there is other satisfactory reason for securing immediate entry."  <u>Camara</u>, 387 U.S. at 539–40.

"In California, an inspection warrant may be issued authorizing local official 'to conduct any inspection required or authorized by state or local law or regulation relating to building, fire, safety, plumbing, electrical, health, labor, or zoning' where 'there is reason to believe that a condition of nonconformity exists with respect to the particular place, dwelling, structure, premises, or vehicle.'"  <u>Sanchez v. Riverside Cnty.</u>

1   Code Enf't Agency, No. EDCV 15-2493 SJO(JC), 2018 WL 1801251, at *16 (C.D.

2   Cal. Jan. 17, 2018), report and recommendation adopted, No. EDCV 15-2493

3   SJO(JC), 2018 WL 1801884 (C.D. Cal. Apr. 6, 2018) (citing Cal. Civ. Proc. Code §§

4   1822.50, 1822.52).

5          Finally, neither the Ninth Circuit nor the Supreme Court has held that the

6   Fourth Amendment requires notice before executing a valid inspection warrant.  See

7   generally, Camara, 387 U.S. 523 (describing the requirements for an administrative

8   warrant under the Fourth Amendment without discussing or mentioning a notice

9   requirement); see also City of Los Angeles v. Patel, 135 S. Ct. 2443, 2456 (2015)

10  ("[N]othing in our decision today precludes an officer from conducting a surprise

11  inspection by obtaining an ex parte warrant ...."); Marshall, 436 U.S. at 315-24

12  (affirming right of a federal administrative agency to obtain an ex parte warrant).

13         **2.     Analysis**

14         Here, Plaintiff appears to allege the second inspection on August 13, 2020,

15  violated his Fourth Amendment rights.[3]  Dkt. 73 at 49–54.  However, Plaintiff admits

16  that Defendants completed this inspection pursuant to a warrant issued from the

17  court.  Id. at 6, 15, 49–50.  Construed liberally, Plaintiff presents two (2) challenges to

18  the inspection and underlying warrant: (1) the warrant was executed without the

19  twenty-four (24) hour notice required by the court and (2) the warrant was obtained

20  via false pretenses.  Id. at 49–54.

21         With respect to the first argument, there is no constitutional requirement that

22  notice is required before executing an administrative warrant, and therefore Plaintiff

23  cannot sustain a Fourth Amendment claim on this basis alone.

24

25  ───────────────

    [3] The Court has arguably already dismissed this claim without leave to amend.  See Dkts. 68 at 35–

26  36, 46 (recommending dismissal of Claim Five, to the extent it could be construed as a Fourth
    Amendment claim, be dismissed without leave to amend); 70 (Order Accepting Report and

27  Recommendation).  Because Plaintiff articulates his Fourth Amendment claim more clearly in the
    FAC, the undersigned includes this more detailed discussion of the claim's deficiencies, out of an

28  abundance of caution.

1    With respect to the second argument, Plaintiff alleges Defendants obtained the

2  inspection warrant "through deceit" by "falsely claiming unsafe conditions," where

3  there was no "exigency" requiring the issuance of an inspection warrant.  Dkt. 73 at

4  49–50.  As an initial matter, while plaintiffs are generally permitted to bring a Section

5  1983 claim against an officer or non-officer who recklessly or intentionally provide

6  false statements that lead to the issuance of a warrant, it is unclear whether Plaintiff

7  may challenge an administrative warrant based on these grounds where the warrant

8  has not led to Plaintiff's arrest or prosecution.  See, e.g., Galbraith v. Cnty. of Santa

9  Clara, 307 F.3d 1119, 1126 (9th Cir. 2002) (holding a "a coroner's reckless or

10  intentional falsification of an autopsy report that plays a material role in the false

11  arrest and prosecution of an individual can support a claim under 42 U.S.C. § 1983

12  and the Fourth Amendment" (emphasis added)); but see Sanchez 2018 WL 1801251

13  at *19 (citing Galbraith and analyzing the plaintiff's claim that an inspection warrant

14  was supported by a falsified affidavit).

15    In any case, the false statements Plaintiff alleges that Defendants made—

16  concerning exigent circumstances created by unsafe conditions—are not material to

17  the showing of cause for administrative warrants in California; all that was required to

18  obtain a warrant to inspect Plaintiff's address was "reason to believe that a condition

19  of nonconformity exist[ed.]"  See Cal. Civ. Proc. Code §1822.52.  Accordingly, even

20  assuming Plaintiff's Fourth Amendment challenge to the second inspection warrant

21  based on Defendants' allegedly false statements is cognizable, it would fail because the

22  warrant could have been granted even absent the statements at issue.  Galbraith, 307

23  F.3d at 1126 ("a § 1983 plaintiff must show that the investigator 'made deliberately

24  false statements or recklessly disregarded the truth in the affidavit' and that the

25  falsifications were 'material' to the finding of probable cause."); Oceanside Organics

26  v. Cty. of San Diego, 341 F.Supp.3d 1129, 1137 (S.D. Cal. 2018) ("To prevail on the

27  materiality element, Plaintiffs must show that a search warrant would not have issued

28  had the affidavit contained the truthful or omitted information.").

# VII.

## LEAVE TO AMEND

Plaintiff should be granted leave to amend certain claims against certain Defendants.  In the Ninth Circuit, courts should grant leave to amend if it appears possible that the defects in the complaint could be corrected.  <u>Cato v. United States</u>, 70 F.3d 1103, 1106 (9th Cir. 1995) ("A pro se litigant must be given leave to amend his or her complaint, and some notice of its deficiencies, unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment").

Here, no facts could cure the deficiencies with Claims Three and Four. Furthermore, it appears no facts could cure the deficiencies with Plaintiff's claims against the City, which Plaintiff has already had an opportunity to amend.  Dkts. 68, 70.  Accordingly, it is recommended that these claims are dismissed without leave to amend and that the City is terminated as a Defendant in this action.

# VIII.

## RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the District Court issue an order:

(1) accepting this Report and Recommendation;

(2) **DENYING** the Motion to Dismiss with respect to Claims One and Two;

(3) **GRANTING** the Motion to Dismiss with respect to Claims Three and Four **WITHOUT LEAVE TO AMEND**;

(4) **TERMINATING** the City as a Defendant;

(5) **DENYING** the Motion to Strike;

(6) **GRANTING** Plaintiff's request to restore Scott Fazekas as a Defendant; and

(7) **DENYING** Plaintiff's request to add Timothy Peel as a Defendant.

///

///

# IX.

## NOTICE

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the docket number.  No Notice of Appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.

**IT IS SO ORDERED.**

Dated:  June 28, 2022

HONORABLE MARGO A. ROCCONI
United States Magistrate Judge