UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUIE LOPEZ,<br><br>                     Plaintiff,<br><br>     v.<br><br>CITY OF LA HABRA HEIGHTS ET AL,<br><br>                     Defendant. | Case No. 8:21-cv-01193-JGB (MAR)<br><br>REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |

This Report and Recommendation is submitted to the Honorable Jesus G. Bernal, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.

## **SUMMARY OF RECOMMENDATION**

Plaintiff Louie Lopez ("Plaintiff"), who is now proceeding with counsel,[1] has filed a Complaint pursuant to 42 U.S.C. § 1983 ("Section 1983") against the City of La

---

[1] Plaintiff filed the Complaint and litigated most of this case pro se; in fact, he only obtained counsel after Defendants' motion for summary judgment was fully briefed. See Dkt. 152 (Notice of Appearance). Accordingly, while the case is no longer a pro se case civil rights that would qualify for automatic referral to a magistrate judge for all pretrial proceedings pursuant to General Order No. 05-07, the district judge has referred the motion for summary judgment to the undersigned magistrate judge for Report and Recommendation. Dkt. 167.

Habra Heights ("the City") and several City employees (collectively, "Defendants"). ECF Docket No. ("Dkt.") 73. The remaining claims in the operative First Amended Complaint ("FAC") allege that Defendants conspired to retaliate against Plaintiff in violation of his First Amendment rights. See Dkt. 88 (Report and Recommendation recommending that all claims be dismissed except for retaliation and conspiracy to retaliate claims); Dkt. 89 (order accepting Report and Recommendation).

Defendants have filed a motion for summary judgment ("MSJ"). Dkt. 139. For the reasons set forth below, the Court recommends **GRANTING** Defendants' MSJ, in full.

## II.

## PROCEDURAL BACKGROUND

### A. PROCEDURAL HISTORY

On July 12, 2021, Plaintiff instigated this action by filing the Complaint, which named as Defendants the City, several City employees, and several private individuals. Dkt. 1. On August 25, 2021, the City Defendants filed a motion to dismiss. Dkt. 39.

On August 26, 2021, Plaintiff filed applications for the clerk to enter default against several Defendants who did not join in the motion to dismiss. Dkts. 42–50. On August 27, 2021, the clerk entered the default as to several of the Defendants. Dkts. 51–52. On September 1, 2021, those Defendants filed a motion to set aside the default. Dkt. 56.

On November 10, 2021, the undersigned issued a Report and Recommendation, recommending that the motion to set aside defaults be granted, that service be quashed with respect to several Defendants, and that the motion to dismiss be granted in part and denied in part. Dkt. 68. The undersigned recommended that Plaintiff be given leave to amend certain claims. Id. On December 22, 2021, the district judge accepted the Report and Recommendation. Dkt. 70.

2

| | |
|---|---|
| 1 | On February 21, 2022, Plaintiff filed the operative FAC. Dkt. 73. On March 7, |
| 2 | 2022, Defendants filed a motion to dismiss the FAC and a motion to strike portions |
| 3 | of the FAC. Dkts. 74–75. On June 28, 2022, the undersigned issued a Report and |
| 4 | Recommendation recommending that the motion to dismiss be denied with respect to |
| 5 | Plaintiff's retaliation claims against Defendants Scott Fazekas, Fabiola Huerta, |
| 6 | Michael Maurer, Michael Moore, Brandon Sanchez, and Rafferty Wooldridge and that |
| 7 | the motion to dismiss be granted in all other respects. Dkt. 88. The district judge |
| 8 | accepted the Report and Recommendation on August 15, 2022. Dkt. 89. On August |
| 9 | 29, 2022, the remaining Defendants filed an answer. Dkt. 90. |
| 10 | As the case proceeded through discovery, the undersigned resolved several |
| 11 | discovery disputes between the parties. Dkt. 117 (discussing six discovery motions); |
| 12 | Dkt. 138 (reopening discovery for limited purpose). On November 15, 2023, |
| 13 | Defendants filed the instant MSJ. Dkt. 139 ("MSJ"). On January 18, 2024, Plaintiff |
| 14 | filed an opposition. Dkt. 145 ("Opp."). Defendants filed a reply on January 31, 2024. |
| 15 | Dkt. 148 ("Reply"). |
| 16 | On February 22, 2024, Plaintiff's counsel filed a notice of appearance. Dkt. |
| 17 | 152. Accordingly, on March 29, 2024, the district judge vacated the reference to the |
| 18 | undersigned magistrate judge for pretrial purposes. Dkt. 153. On May 23, 2024, |
| 19 | Plaintiff filed a motion to allow him to submit an amended opposition to Defendants' |
| 20 | motion for summary judgment and to extend discovery to support that opposition. |
| 21 | Dkt. 155. Defendants filed an opposition, Dkt. 156, and Plaintiff filed a reply, Dkt. |
| 22 | 157. On June 14, 2024, the district judge granted Plaintiff's motion in part and denied |
| 23 | it in part. Dkt. 159. Specifically, the district judge granted Plaintiff's requests for |
| 24 | leave to file an amended opposition and reopen discovery, but denied Plaintiff's |
| 25 | request to serve more than twenty-five additional interrogatories. Id. |
| 26 | Plaintiff filed a supplemental opposition on September 5, 2024. Dkt. 162 |
| 27 | ("Suppl. Opp."). Plaintiff supported the supplemental opposition with his own |
| 28 | declaration, Dkt. 163, and a supplemental statement of disputed facts, Dkt. 164. |

Defendants filed a supplemental reply on September 16, 2024. Dkt. 166 ("Suppl. Reply").

On November 13, 2024, the district judge referred the pending MSJ to the undersigned for Report and Recommendation. Dkt. 167. Thus, the matter stands submitted.

**B. SUMMARY OF FILINGS AND EVIDENCE**

In support of their MSJ, Defendants submit the following:

(1) Declaration of Antoinette P. Hewett ("Hewett Decl.") (Dkt. 139-1 at 1–3);

(2) Defendants' Amended Demand to Inspect Plaintiff's Property ("Defs. Ex. A") (Dkt. 139-1 at 4–9);

(3) a copy of the dismissal of a lawsuit against one of the City's outside attorneys in state court ("Defs. Ex. B") (Dkt. 139-1 at 10–11);

(4) Plaintiff's Objections and Responses to Defendant's First Set of Interrogatories Relating to Jurisdictional Discovery ("Defs. Ex. C"), served on November 3, 2022 (Dkt. 139-1 at 12–38);

(5) excerpts of the transcript of the June 15, 2023 deposition of Plaintiff Louie Lopez ("Lopez Dep.") (Dkt. 139-1 at 39–49);

(6) a copy of the FAC (Dkt. 139-1 at 50–108);

(7) a copy of the Complaint (Dkt. 139-1 at 109–157);

(8) Declaration of Matthew Nardella ("Nardella Decl.") (Dkt. 139-2);

(9) Declaration of Scott Fazekas ("Fazekas Decl.") (Dkt. 139-3); and

(10) Statement of Uncontroverted Facts and Conclusions of Law ("DSUF") (Dkt. 139-4).

In support of his oppositions to the MSJ, Plaintiff submits the following:

(1) Declaration of Louie Lopez ("Lopez Decl.") (Dkt. 145-1);

(2) opposition to Defendants' SUF ("PSUF") (Dkt. 145-2);

(3) a copy of the FAC (Dkt. 145-3 at 1–59);

4

| | | |
|---|---|---|
| 1 | (4) | a copy of the undersigned's June 28, 2022 Report and Recommendation |
| 2 | | (Dkt. 145-3 at 60–87); |
| 3 | (5) | an attorney misconduct complaint filed with the State Bar of California |
| 4 | | against Michael J. Maurer ("Pl. Ex. C") (Dkt. 145-3 at 88–93); |
| 5 | (6) | an attorney misconduct complaint filed with the State Bar of California |
| 6 | | against Brandon Sanchez ("Pl. Ex. D")( Dkt. 145-3 at 94–147); |
| 7 | (7) | a follow up complaint to the State Bar of California regarding Michael J. |
| 8 | | Maurer ("Pl. Ex. E") (Dkt. 145-3 at 105–40); |
| 9 | (8) | Code Compliance Agreement ("Pl. Ex. F") (Dkt. 145-3 at 141–51); |
| 10 | (9) | a copy of the City of La Habra Heights General Plan pertaining to land |
| 11 | | use, dated May 2004 ("Pl. Ex. G") (Dkt. 145-3 at 152–54); |
| 12 | (10) | Second Declaration of Louie Lopez ("Second Lopez Decl.") (Dkt. 163); |
| 13 | | and |
| 14 | (11) | Supplemental opposition to Defendants' SUF ("SPSUF") (Dkt. 164). |

The Court notes that, in their replies, Defendants make several objections to the form and substance of Plaintiff's evidence. See Dkt. 148-1 (Defendants' Objections to Plaintiff's Evidence Filed in Support of Opposition to MSJ); Suppl. Reply at 7. Except as indicated below, the Court does not rule on these objections because, even liberally construing Plaintiff's filings as properly submitted evidence, Defendants' MSJ should be granted on its merits. In any case, the Court notes that it has independently considered the admissibility of the evidence underlying both parties' papers and has not considered facts that are irrelevant or based upon inadmissible evidence.

### III.

### LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex

5

1  Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In other words, summary judgment must
2  only be entered "if, under the governing law, there can be but one reasonable
3  conclusion as to the verdict."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250
4  (1986).
5       The moving party has the initial burden to identify relevant portions of the
6  record that demonstrate the absence of a genuine dispute of material fact as to the
7  essential elements of each cause of action upon which the moving party seeks
8  judgment.  Celotex Corp., 477 U.S. at 323.  If the moving party sustains its burden,
9  the burden then shifts to the nonmovant to cite to "particular parts of materials in the
10 record" demonstrating a material fact is "genuinely disputed."  Fed. R. Civ. P.
11 56(c)(1); Celotex Corp., 477 U.S. at 324; Anderson, 477 U.S. at 256.
12      "Material facts are those which may affect the outcome of the case."  Long v.
13 Cnty. of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); In re Caneva, 550 F.3d
14 755, 760 (9th Cir. 2008).  A genuine dispute as to a material fact exists "if the evidence
15 is such that a reasonable jury could return a verdict for the non-moving party."
16 Anderson, 477 U.S. at 248.
17      "If the nonmoving party fails to produce enough evidence to create a genuine
18 issue of material fact, the moving party wins the motion for summary judgment."
19 Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).
20 "But if the nonmoving party produces enough evidence to create a genuine issue of
21 material fact, the nonmoving party defeats the motion."  Id.
22      When ruling on a summary judgment motion, the district court must view all
23 inferences drawn from the underlying facts in the light most favorable to the
24 nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
25 587 (1986).  Summary judgment is therefore not appropriate "where contradictory
26 inferences may reasonably be drawn from undisputed evidentiary facts."
27 Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1335 (9th Cir. 1980).
28 However, when there are two opposing versions of the facts and one is blatantly

contradicted by the record, the court cannot adopt that version for summary-judgment purposes. Scott v. Harris, 550 U.S. 372, 380 (2007) (court declined to adopt nonmovant's version of facts because they were so contradicted by videotape that no reasonable jury could have believed them). Finally, the Court must not make credibility determinations regarding the evidence offered on summary judgment. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630–31 (9th Cir. 1987) (citing Matsushita, 475 U.S. at 587).

## IV.

## FACTUAL SUMMARY

Except as otherwise noted, these facts are undisputed:[2]

Plaintiff owns a house at 1550 Vista Del Valle Way in La Habra Heights, California ("the Property"). DSUF 1; FAC ¶ 1. The Property was originally permitted to be a single-family residence with three bedrooms. DSUF 2; Fazekas Decl. ¶ 4. Sometime prior to 2018, Plaintiff began making improvements to the Property to add multiple bedrooms. DSUF 3; FAC ¶ 3.

In November of 2016, the City received information about the Property indicating that (1) construction was taking place; (2) heavy parking including a motor home was noticed in the driveway; and (3) Air BNB use was occurring. DSUF 4; Fazekas Decl. ¶ 5. The City could not find a record of any construction allowing improvements at Plaintiff's property. DSUF 5; Fazekas Decl. ¶ 5. Plaintiff does not dispute that there were no construction permits on file, but appears to imply this could be due to a failure on the City's part; Plaintiff alleges that, on or about March 4, 2005, he had made a request to the City for original plans for the Property, but that

---

[2] As Defendants note, Plaintiff has failed to dispute several facts listed in Defendants' SUF and has failed to object to the testimony of Defendants' expert, Matthew Nardella. Reply at 5–6; Suppl. Reply at 8. Except as otherwise noted, the Court accepts as undisputed the facts and evidence that Plaintiff has failed to explicitly contest.

the City rejected his request due to its failure to maintain a copy of the plans pursuant to Cal. Health & Saf. Code section 19850. SPSUF 5; Lopez Decl. ¶ 2.

The City received further complaints in May of 2018 and obtained an inspection warrant to investigate the alleged nuisance violations at the Property. DSUF 6; Fazekas Decl. ¶ 5. On August 6, 2018, the City entered the Property and observed extensive unpermitted construction.[3] DSUF 7; Fazekas Decl. 6. At the inspection, City employees observed approximately twenty rooms, even though the original permits allowed only eight. DSUF 8; Fazekas Decl. ¶ 6. These unpermitted rooms included eight unpermitted bathrooms utilizing unpermitted sewer connections to the existing septic system. DSUF 9. The bedrooms had keypads to restrict entry. DSUF 10; Fazekas Decl. ¶ 6. City employees also observed an unpermitted deck and detached two-story dwelling unit. DSUF 11–12; Fazekas Decl. ¶ 6.

On August 28, 2018, the City issued a "Notice and Order to Vacate" ("Notice"), which stated that the property was determined to be dangerous under Sections 302 and 401 of the 1997 Uniform Code for the Abatement of Dangerous Buildings ("UCADB"). DSUF 13. The Notice cited the following violations:

(1) UCADB section 302(1): Doors, aisles, passageways, stairways, or other means of exit that are not of sufficient width or size or are not so arranged as to provide safe and adequate means of exit in case of fire or panic.

(2) UCADB section 302(8): A building or structure that because of faulty construction is likely to partially or completely collapse.

(3) UCADB section 302(9): A building or structure that is manifestly unsafe for the purpose for which it is being used.

---

[3] Plaintiff marks this fact as disputed, but does not appear to actually dispute the fact that the City observed unpermitted construction at the Property—rather, he merely points to Defendants' alleged failures to maintain the building plans and properly apply their grandfather provisions that would have exempted his alterations from the permit requirement. See SPSUF 7. The specific provisions are discussed in more detail below.

8

|    |    |    |
|----|----|----|
| 1  | (4) | UCADB section 302(13): A building or structure constructed or |
| 2  |    | maintained in violation of any specific requirement or prohibition |
| 3  |    | application to such building or structure, namely the requirements |
| 4  |    | imposed by the California Building Standards Commission ("CBSC"). |
| 5  | (5) | UCADB section 302(16): A building or structure because of faulty |
| 6  |    | electric wiring, gas connections, or heating apparatus is determined to be |
| 7  |    | a fire hazard. |
| 8  | (6) | La Habra Heights Municipal Code ("LHHMC") section 5.2.40(c): No |
| 9  |    | person shall use, occupy, or maintain any unpermitted structure or |
| 10 |    | device that requires a permit. |

11 DSUF 13; Fazekas Decl. ¶ 7.  The Notice provided a seven-day grace period for
12 Plaintiff to vacate; the City also ordered the electricity to be shut off pursuant to
13 LHHMC section 5.2.20(E).  DSUF 14; Fazekas Decl. ¶ 8.  Plaintiff does not dispute
14 that the Notice was issued or that it contained these citations but instead argues that
15 the City should have instead "grandfathered in" the Property pursuant to the City's
16 2004 General Plan; specifically, Plaintiff cites Policies 22 and 23 of the General Plan
17 to argue that the City should have allowed his unpermitted alterations given that his
18 home was built in 1957, before the City was incorporated in 1978.  SPSUF 13;
19 Plaintiff Decl. 13.  Plaintiff argues that, in light of these policies, the issuance of the
20 Notice is itself evidence of retaliation and conspiracy.  SPSUF 13.  On October 9,
21 2018, power lines were found running from the neighboring property to an electrical
22 subpanel on the Property.  DSUF 15; Fazekas Decl. ¶ 9.

23       On July 16, 2020, the City requested consent from Plaintiff to enter and
24 inspect the property, with a deadline to respond of July 23, 2020; on July 29, 2020,
25 Plaintiff sent a thirty-nine-page letter to the City refusing to consent to the inspection.
26 DSUF 17; Fazekas Decl. ¶ 13.  Thus, the City applied for a second inspection warrant.
27 DSUF 18; Fazekas Decl. ¶¶ 14–15.  The inspection warrant request was granted, and
28 the City posted it at Plaintiff's property at 8 a.m. on August 12, 2020—more than

twenty-four hours in advance of the August 13, 2020 inspection date. Id. The inspection took place on August 13, 2020. Id.[4]

At the August 13, 2020, inspection, City found that Plaintiff still had at least seven unpermitted bedrooms and that numerous new bathrooms had been built. DSUF 19; Fazekas Decl. ¶¶ 16–17. The bedrooms and bathrooms had numerous health and safety violations, including:

    (1)    each bathroom had an illegal trap connection, which have the ability to expose odors of sewer gas into the associated bedroom;

    (2)    wiring violations were readily visible;

    (3)    certain bedrooms did not have the required size windows for safe escape;

    (4)    an air conditioning unit had been installed without a permit;

    (5)    electrical circuits were sealed up behind drywall, which made it inaccessible;

    (6)    two laundry "rooms" had been built that were coin-operated;

    (7)    an unpermitted deck was built; and

    (8)    a small shed out in the yard had been converted into a room by adding a second story to it that had a sleeping room, which had access by way of a ladder.[5]

DSUF 20; Fazekas Decl. ¶ 18. While the City conducted its inspection, employees observed that tenants were present.[6] DSUF 21; Fazekas Decl. ¶ 19. The City alleges

---

[4] Plaintiff disputes DSUF 17–18 in general, but does not appear to dispute the actual timeline or chain of events; rather, Plaintiff only appears to dispute the City's motivation in requesting the warrant. See SPSUF 17–18; Second Lopez Decl. ¶¶ 2–3, 11–12.

[5] Plaintiff disputes this with the same response as DUSFs 5 and 7; he argues that the City should have applied their grandfather provisions, but does not actually dispute that the City found these violations. SPSUF 20.

[6] Plaintiff objects on hearsay grounds to a statement that Fazekas allegedly overheard Plaintiff speak to a tenant, but does not appear to produce any evidence to dispute that Fazekas observed that tenants were present. SPSUF 21.

10

1  that, as a result of the inspection, they sent a second "Notice of Order to Vacate,"
2  dated August 28, 2020; Plaintiff alleges that he never received this notice.  DSUF 22;
3  Fazekas Decl. ¶ 20; SPSUF 22; Lopez Decl. ¶ 16.

4        The City also alleges that it sent Plaintiff a detailed letter of corrections to be
5  made and advised him to hire a contractor to create a plan to remove a portion of the
6  drywall and expose the construction to fully assess the health and safety issues;
7  Plaintiff alleges that he never received this letter.  DSUF 23; Fazekas Decl. ¶ 21;
8  SPSUF 23; Lopez Decl. ¶ 16.  The City alleges that Plaintiff failed to follow through
9  with completing plans and documentation which would have allowed him to proceed;
10 Plaintiff alleges that he attempted to obtain permits and should have been able to
11 according to the City's General Plan but was prevented from doing so by Defendants.
12 DUSF 24; Fazekas Decl. ¶ 22; SPSUF 24; Lopez Decl. ¶ 17.

13       Eventually Plaintiff filed the instant lawsuit.  Dkt. 1.  Later in the litigation,
14 when Defendants noticed an inspection pursuant to Fed. R. Civ. P. 34, Plaintiff filed a
15 lawsuit against each of the City's outside attorneys in state court, which were
16 eventually dismissed.  Hewitt Decl. ¶¶ 2–3; Defs. Ex. B.

17       On June 22, 2023, Defendants inspected the Property, and their expert
18 confirmed the conditions the City identified when it conducted the previous
19 inspection.  DSUF 30; Nardella Decl. ¶ 4.  There are no permits on file that are
20 consistent with the current configuration of the Property.[7]  DSUF 31; Nardella Decl.
21 ¶ 3.  The City expressly forbids short term rentals.  Nardella Decl. ¶ 3.  Despite this,
22 the Property was modified to be a multi-family house with multiple rooms apparently
23 for rent.  Id. ¶¶ 4–5.  The expert noted at least seven bedrooms and eight bathrooms
24 in the Property.  DUSF 32; Nardella Decl. ¶ 5.  In addition, on the lower floor next to
25 the garage, he observed a long room and an unfinished bathroom, both of which had
26 no windows and could only be accessed with a keypad-locked door next to the garage

---

28 [7] Plaintiff disputes the reason that there are no permits on file, but does not appear to dispute that there are no permits on file.  SPSUF 31.

11

1 door. DSUF 33; Nardella Decl. ¶ 5. Several of the rooms did not have code-required
2 smoke and carbon monoxide detectors. DSUF 34; Nardella Decl. ¶ 5; SPSUF 34.
3 The expert also saw exposed wiring and noncompliant extension cords used to power
4 appliances. DSUF 35; Nardella Decl. ¶ 9. He also identified a detached shed with an
5 eighth bedroom, a ninth bathroom, and a second floor accessed by a ladder. DSUF
6 36; Nardella Decl. ¶ 10. The second floor had a ceiling height of less than five feet
7 and the downstairs had a ceiling height of less than seven feet, both of which are non-
8 compliant. DSUF 36; Nardella Decl. ¶ 10. Ultimately, the expert determined that the
9 property was in violation of local ordinances and state regulations, both of which
10 require alterations to be approved and permitted before commencing work. DSUF
11 37; Nardella Decl. ¶ 11.

12 At his deposition, Plaintiff could not substantively explain what the City did to
13 violate his constitutional rights. DSUF 40; Defs. Ex. C. At his deposition, when
14 asked what the "grudge" was that he believed the City had against him, Plaintiff
15 recalled an incident in which his brother and Defendant Moore "had some words" in
16 2018 but admitted he was not present. DSUF 41; Lopez Dep. 276:10–25, 277:1–19,
17 278:6–12. Plaintiff admitted that he could not think of anything ese that occurred
18 between himself and the City that would form the basis of the grudge. DUSF 41;
19 Lopez Dep. 278:6–12. However, Plaintiff views the "draconian act" of shutting off of
20 his electricity as evidence that he was singled out by the City. SPSUF 41–42; Lopez
21 Decl. ¶ 17.

**V.**

**DISCUSSION**

**A. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIMS**

**1.  Applicable law**

27 "To state a First Amendment retaliation claim, a plaintiff must plausibly allege
28 that (1) he was engaged in a constitutionally protected activity, (2) the defendant's

12

1 actions would chill a person of ordinary firmness from continuing to engage in the
2 protected activity and (3) the protected activity was a substantial or motivating factor
3 in the defendant's conduct." Capp v. Cty. of San Diego, 940 F.3d 1046, 1053 (9th
4 Cir. 2019) (internal quotation marks omitted) (internal citations omitted).  The First
5 Amendment provides that "Congress shall make no law . . . abridging the freedom of
6 speech . . .." U.S. Const. amend. I.  The First Amendment also guarantees the right
7 "to petition the Government for a redress of grievances." White v. Lee, 227 F.3d
8 1214, 1227 (9th Cir. 2000).

### 2. Plaintiff has failed to identify constitutionally protected activity

Here, Plaintiff has failed to raise a genuine dispute of material fact as to whether any Defendant retaliated against him for engaging in constitutionally protected activity.  First, the Court notes that Plaintiff has not specifically identified what constitutionally protected activity forms the basis of his claims.  Defendants note that Plaintiff did not clearly identify the basis of his retaliation claim in his discovery responses or at his deposition, referencing only a vague altercation between his brother and City employees that Plaintiff did not witness.  DUSF 40–42.  To dispute this fact, Plaintiff initially only pointed to his original opposition and declaration.  SPSUF 40–42.  Plaintiff's opposition and declaration allege that the City employees have taken acts to retaliate against Plaintiff for exercising "Constitutionally protected free speech," but do not actually describe the acts of free speech that would have instigated Defendants' retaliatory conduct.  See Opp. at 5 ("Plaintiff's Declaration and evidence raises a triable issue of material fact that Defendants actual reason was retaliatory animus in reprisal for his Constitutionally protected free speech."); see generally, Lopez Decl.

In his supplemental opposition, Plaintiff characterizes several of the incidents described above as protected activity.  Specifically, Plaintiff alleges that:

13

      (1) on or about March 4, 2005, Fazekas and Moore rejected Plaintiff's request to obtain the original plans/blueprints for the property, thereby violating their statutory duty to maintain such plans;

      (2) on July 16, 2018, Moore angrily "threw out" Plaintiff and his attorney and brother David Lopez, when David stated to Moore that City employees should not enter the Property without a prior, 24-hour notice;

      (3) on January 21, 2020, Wooldridge sent away Plaintiff's contractor when Plaintiff brought him to discuss the case; and

      (4) on February 19, 2020, Plaintiff filed a complaint with the State Bar of California against City attorneys Mauer and Sanchez.

Suppl. Opp. at 11–12 ("Plaintiff has produced evidence…that he engaged in significant First Amendment-protected speech and a constitutionally protected activity, by each of the following: …").

      With respect to Plaintiff's first alleged protected activity, Plaintiff has not cited any authority that would support his contention that requesting blueprints for his property was a protected activity under the First Amendment. In any case, to the extent that Plaintiff would argue that Defendants' alleged statutory obligation to preserve the blueprints could somehow transform Plaintiff's request into constitutionally protected free speech, Plaintiff has failed to raise a genuine dispute as to whether Defendants were actually statutorily obligated to preserve the Property's blueprints. Cal. Health & Saf. Code section 19850 only requires a city to "of the plans of every building, during the life of the building, <u>for which the department issued a building permit</u>." Cal. Health & Saf. Code § 19850 (emphasis added). Here, Plaintiff has not alleged or produced any evidence to support a contention that the City issued the original building permit for the Property. Indeed, Plaintiff's primary argument, that the City should have applied the grandfather provision to the Property, relies on the fact that the Property was constructed before the City was incorporated; this would strongly imply that the City never issued the original building permit.

1  Accordingly, Plaintiff has failed to raise a genuine dispute as to whether the City had a
2  statutory obligation to preserve the Property's original plans, or even whether the City
3  ever possessed the plans such that it would be in a position to preserve them.[8]

4  Second, to the extent that Plaintiff alleges Defendants are retaliating against
5  him in response to the 2018 altercation between his brother and Defendant Moore,
6  Plaintiff has not explained why his brother's conduct constituted constitutionally
7  protected activity.[9] Furthermore, this altercation could not form the basis for
8  Plaintiff's retaliation claims because it occurred <u>after</u> Plaintiff alleges the retaliation
9  began; according to Plaintiff's own allegations, by the time his brother exchanged
10 words with Defendant Moore, Defendants had already began treating him differently
11 by destroying the Property's blueprints and attempting to inspect the property without
12 proper notice. Lopez Decl. ¶¶ 2–3 (alleging the City destroyed documentation in
13 2004 and alleging that Plaintiff's brother had an altercation with Moore when the City
14 employees came to execute the inspection warrant, allegedly without 24-hour notice).
15 Plaintiff cannot logically argue that Defendants began retaliating against him for
16 something that had not yet happened. See, e.g., Polk v. OSI Elecs., Inc., No. CV-14-
17 292-MWF (ASX), 2014 WL 12787639, at *5 (C.D. Cal. Feb. 24, 2014) ("Logically, a
18 protected activity must occur prior to any alleged retaliation.").

19 Plaintiff's third alleged protected activity poses the same problems as the first
20 two, namely that: (1) it is not clear, and Plaintiff makes no attempt to explain, how his
21 conduct was constitutionally protected; and (2) these events happened after Plaintiff
22 alleges the retaliation began.

---

[8] As Defendants note, there is an argument that claims based on this 2004 incident may be barred by the statute of limitations; however, because Plaintiff cites other alleged protected activities, and because Plaintiff's claims fail for other reasons, the Court does not substantively address this issue.

[9] Furthermore, it is not clear that Plaintiff could bring retaliation claims based on his brother's alleged constitutionally protected activity because, under this theory, it would be Plaintiff's brother's constitutional rights at issue, rather than Plaintiff's. See Johns v. County of San Diego, 114 F.3d 874, 876–877 (9th Cir. 1997) ("constitutional claims are personal and cannot be asserted vicariously").

1  Finally, with respect to Plaintiff's fourth alleged protected activity, filing a
2  complaint with the state bar may be protected as a part of Plaintiff's First Amendment
3  right to file grievances. See Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S.
4  508, 513 (1972) ("[T]he right of access to the agencies and courts to be heard ... is part
5  of the right of petition protected by the First Amendment."). However, again,
6  Plaintiff only filed the complaint long after he alleges the retaliation began, shortly
7  before he filed the complaint in the instant case; indeed, the complaint concerned
8  most of the same incidents at issue in this action. Plaintiff cannot logically claim that
9  Defendants retaliated against him for filing a complaint related to their alleged
10 retaliation.
11 Ultimately, none of the conduct that Plaintiff cites appears to be
12 constitutionally protected, and the Court cannot discern any other constitutionally
13 protected activity that could have sparked Defendants' alleged retaliation.
14 Accordingly, Defendants are entitled to judgment on Plaintiff's retaliation claims as a
15 matter of law.

16 **3.    Plaintiff has failed to raise a genuine dispute as to whether**
17 **Defendants' actions were substantially motivated by any**
18 **constitutionally protected activity**

19 In any case, even assuming Plaintiff had clearly identified constitutionally
20 protected activity, Plaintiff has not raised a genuine dispute as to whether Defendants'
21 actions were substantially motivated by Plaintiff's constitutionally protected activity.
22 Plaintiff does not dispute or attempt to contradict any of Defendants' evidence
23 demonstrating that the Property had several unpermitted alterations and safety code
24 violations. See SPSUFs 19–20 (Plaintiff failing to dispute that the City found several
25 unpermitted additions and numerous health and safety violations at their original
26 inspection); SPSUFs 30–37 (Plaintiff marking "undisputed" several of the
27 observations made by Defendants' expert at the inspection during this litigation).
28 Defendants argue that these unpermitted alterations and safety code violations

16

provided a rational non-retaliatory basis for all of their enforcement actions. Again, Plaintiff does not dispute the alterations or safety code violations, but instead argues that Defendants purposefully disregarded procedures that would have allowed these alterations and additions to be "grandfathered in," and instead "singled out" Plaintiff by subjecting the Property to repeated harassing inspections, turning off Plaintiff's electricity, threatening Plaintiff, and ultimately requiring Plaintiff and his tenants to vacate the Property. Lopez Decl. ¶¶ 13–14. As evidence that his property was irrationally singled out for harsher treatment, Plaintiff notes that Defendant Moore has testified that the City has not shut off any other property's electricity between 2015 and 2019. See Second Lopez Decl. ¶ 6, Ex. A (Defendant Moore's response to Special Interrogatory No. 12).

Given that Plaintiff has not disputed that the Property had several unpermitted alterations and safety violations, in order to raise a genuine dispute as to Defendants' retaliatory animus, Plaintiff would have to submit some evidence to show that the City could have, but did not, treat other similarly situated properties more harshly. Plaintiff has not submitted any such evidence. As an initial matter, it is not clear to the Court from Plaintiff's declaration and oppositions that the procedures he cites would have exempted him from all permit requirements and compliance with safety code violations; Plaintiff has not otherwise submitted any evidence—such as an expert declaration—that would raise a dispute as to whether Defendants could have actually afforded his Property more favorable treatment. Furthermore, even assuming that Defendants could have treated Plaintiff less harshly, the only evidence that Plaintiff submits to support his contention that Defendants did in fact treat him more harshly is Moore's testimony that the City did not shut off any other property's electricity between 2015 and 2019. This testimony is insufficient, on its own, to raise a dispute as to whether the City could or did treat Plaintiff's Property more harshly than other similarly situated properties. This single piece of testimony says nothing about whether other similarly situated properties even existed within the City during

1 the same narrow timeframe, or whether other similarly situated properties might have
2 had their electricity shut off outside of this four-year window.  Ultimately, while
3 Moore's testimony could go toward establishing Defendants' retaliatory animus in the
4 context of other evidence, the Court cannot find that Moore's limited testimony is
5 enough to raise a genuine dispute as to whether Defendants treated Plaintiff's
6 Property more harshly than any other property with as many undisputed unpermitted
7 alterations and safety code violations.

8      In any case, even assuming Defendants could have done more to accommodate
9 the Property's modifications or otherwise deal with Plaintiff more fairly, Plaintiff has
10 produced no evidence that Defendants' failure to do so was actually motivated by
11 Plaintiff's constitutionally protected activity.  Indeed, Defendants' failure to
12 accommodate Plaintiff's modifications may have resulted from Defendants' negligent
13 lack of awareness of the relevant policies, or even from Plaintiff's own failure to
14 cooperate with the applicable procedure.  In fact, even if Defendants dealt with
15 Plaintiff more harshly in response to Plaintiff's conduct, it would not rise to the level
16 of a First Amendment violation unless that conduct was constitutionally protected.
17 As discussed above, Plaintiff has not produced any evidence that would show he was
18 engaged in any constitutionally protected activity that motivated Defendants to
19 retaliate against him.

20      Ultimately, Defendants are entitled to summary judgment on Plaintiff's
21 retaliation claims because Plaintiff has not produced sufficient evidence to create a
22 genuine dispute as to whether he was engaged in constitutionally protected activity or
23 whether Defendants treated the Property differently as compared to any similarly
24 situated property.  Finally, even assuming that Defendants could have treated Plaintiff
25 more fairly or that Defendants departed from typical procedure with respect to the
26 Property, no reasonable jury could find in Plaintiff's favor on his retaliation claims
27
28

because he has produced no evidence that Defendants' actions were substantially motivated by Plaintiff's constitutionally protected conduct.[10]

## B.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S COSNPIRACY CLAIM

"Conspiracy is not itself a constitutional tort under § 1983." Lacey v. Maricopa Cty., 693 F.3d 896, 935 (9th Cir. 2012). Rather, a conspiracy claim can "enlarge the pool of responsible defendants by demonstrating their causal connections to the violation." Id. In other words, alleging a conspiracy in section 1983 actions can: (1) "draw in private parties who would otherwise not be susceptible to a § 1983 action because of the state action doctrine" or (2) "aid in proving claims against otherwise tenuously connected parties in a complex case." Id. (internal citations omitted).

In order to state a claim for conspiracy under section 1983, a plaintiff must allege "an agreement or 'meeting of the minds' to violate constitutional rights." Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2002) (citing United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1540–41 (9th Cir. 1989) (en banc)). Importantly, a plaintiff must also sufficiently allege an underlying constitutional violation. Hart v. Parks, 450 F.3d 1059, 1071 (9th Cir. 2006) (quoting Woodrum v. Woodward Cty., Oklahoma, 866 F.2d 1121, 1126 (9th Cir. 1989)).

---

[10] The Court previously dismissed Plaintiff's equal protection claim as duplicative because the two claims appeared under the same heading and the equal protection appeared to proceed on the same theory of retaliation underlying Plaintiff's First Amendment claims. Dkt. 88 at 14–15. However, the Court notes that an equal protection "class of one" claim would not necessarily require Plaintiff to show that he was engaged in constitutionally protected activity—only that he was treated differently with no rational basis. See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). In any case, even if Plaintiff were proceeding on his equal protection theory, Defendants would still be entitled to summary judgment because Plaintiff has failed to produce any evidence that could show that he was treated differently than other similarly situated individuals—at best, he has only produced evidence that he could have been treated more fairly, but has produced nothing to show that other similarly situated individuals were treated more fairly in practice. As discussed above, Plaintiff's lone citation to Moore's response that the City did not shut off the electricity of any house between 2015–19 is insufficient to create a dispute as to this fact because there is no evidence that any similarly situated properties existed during this timeframe. Conversely, Defendants produce ample evidence that they took actions against the Property due to multiple observed health and safety violations and City code violations—Plaintiff has produced no evidence that would show that this is not a rational basis for Defendants' conduct.

Here, as discussed above, Plaintiff has failed to raise a genuine dispute of material fact as to whether any Defendant took any retaliatory action because of Plaintiff's constitutionally protected activity. See above, subsection V.A. Because no reasonable jury could find for Plaintiff on his retaliation claim, it follows that any conspiracy theory based on that retaliation claim must fail. Hart, 450 F.3d at 1071 (affirming district court's grant of summary judgment on conspiracy claim where plaintiff had not shown any deprivation of constitutional rights resulted from the alleged conspiracy). Accordingly, Defendants are entitled to summary judgment on Plaintiff's conspiracy claim.

## VI.

## **RECOMMENDATION**

**IT IS THEREFORE RECOMMENDED** that the District Court issue an order:

(1) accepting this Report and Recommendation;

(2) **GRANTING** Defendants' Motion for Summary Judgment; and

(3) entering judgment **DISMISSING** this action with prejudice and without leave to amend.

Dated: December 04, 2024

HONORABLE MARGO A. ROCCONI
United States Magistrate Judge